***********
Upon review of the competent evidence of record, with reference to the errors assigned, and findings no good grounds to receive further evidence, or to rehear the parties or their representatives, the Full Commission affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into at the hearing before the Deputy Commissioner as:
 STIPULATIONS *Page 2 
1. An employment relationship existed between the parties at all times relevant to these proceedings.
2. Roadway Express, Inc. (hereinafter referred to as "Defendant") was self-insured, for the purposes of meeting the requirements of the Workers' Compensation Act of the State of North Carolina, with Gallagher Bassett Services, Inc. as its servicing agent at all times relevant to these proceedings.
3. The parties are subject to the North Carolina Workers' Compensation Act.
4. Plaintiff alleges that he sustained an injury by accident on October 8, 2006.
5. Plaintiff's average weekly wage is $1,388.10, yielding the maximum compensation rate for the year 2006 of $730.00 per week.
6. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits:
 a. Stipulated Exhibit one (1) — Pre-trial Order dated May 10, 2007;
 b. Stipulated Exhibit two (2) — North Carolina Industrial Commission forms and filings;
 c. Stipulated Exhibit three (3) — Employee's Notice of Injury or Recurrence dated October 13, 2006;
 d. Stipulated Exhibit four (4) — Supervisor's Report of Employee Injury Investigation;
 e. Stipulated Exhibit five (5) — Plaintiff's medical records for the alleged October 8, 2006 accident, including a medical record's index;
 f. Stipulated Exhibit six (6) — Plaintiff's medical records prior to the alleged October 8, 2006 accident — Dr. Mark Andrew Lyerly; *Page 3 
 g. Stipulated Exhibit seven (7) — Plaintiff's medical records prior to the alleged October 8, 2006 accident — Dr. David Daniel DiLoreto;
 h. Stipulated Exhibit eight (8) — Driver's Daily Log from October 1, 2006 through October 12, 2006;
 i. Stipulated Exhibit nine (9) — Plaintiff's medical records after the alleged October 8, 2006 accident — Dr. David Daniel DiLoreto;
 j. Stipulated Exhibit 10 — Temporary total disability payments from October 16, 2006 through January 9, 2007;
 k. Stipulated Exhibit 11 — Driver's Vehicle Condition Reports — M-11 — for vehicle number 865058 from October 6, 2006 through October 17, 2006;
 l. Stipulated Exhibit 12 — Recent Repair History Print for vehicle number 865058 from September 11, 2005 through November 10, 2006;
 m. Stipulated Exhibit 13 — Dispatch Inquiry from October 7, 2006 through October 8, 2006;
 n. Stipulated Exhibit 14 — Employee's Notice of Injury or Recurrence dated June 15, 1999 and accompanying documents;
 o. Stipulated Exhibit 15 — Employee's Notice of Injury or Recurrence dated October 13, 2006;
 p. Stipulated Exhibit 16 — Supervisor's Report of Employee Injury Investigation;
 q. Stipulated Exhibit 17 — Roadway Express Medical Examination Reports dated March 24, 2003 and May 8, 2006.
 *********** *Page 4 ISSUES
The issues for determination are:
1. Whether Plaintiff sustained a compensable injury by accident, as defined by the North Carolina Workers' Compensation Act, on October 8, 2006?
2. Whether Plaintiff is entitled to recover benefits under the North Carolina Workers' Compensation Act?
 ***********
Based upon the competent and the credible evidence of record, as well as any reasonable inferences that may be drawn therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is a 62-year-old high school graduate who worked as a truck driver for approximately 40 years.
2. Plaintiff began working for Defendant as a casual driver in July 1987. He became a full-time pick up and delivery driver on April 21, 1990, and worked in that capacity until June 2005, when he became a line haul, or over-the-road driver. As a line haul driver, Plaintiff drove to Columbus, Ohio three (3) times each week.
3. Plaintiff's responsibilities and duties as a truck driver required him to complete and maintain a number of documents and records, many of which federal and state law required. During Plaintiff's orientation with Defendant, Plaintiff received specific training on how to complete and to maintain documents and records in compliance with federal and state law. Plaintiff acknowledged that his failure to complete and maintain accurate documents and records, as required by federal and state law, could be a basis for his termination from employment with Defendant. *Page 5 
4. Among the records that federal law required Plaintiff to complete and to maintain both before each trip and after each trip was a Driver's Vehicle Condition Report — M-11 (hereinafter referred to as M-11). The M-11 was a record of any vehicle defects noted by a driver before, during, and after each trip. Over the years while Plaintiff worked for Defendant, Plaintiff continued to receive regular training regarding the responsibilities and the duties of Defendant's drivers. Plaintiff testified that he always followed Defendant's policies, as well as the federal laws and state laws applicable to truck drivers. Plaintiff acknowledged that many of the responsibilities and the duties imposed upon him by federal law, such as completing and maintaining the M-11, were for his safety and his protection, as well as the safety and the protection of the general public.
5. During Plaintiff's orientation with Defendant, and throughout his employment with Defendant, Plaintiff received training on the proper way to report injuries, as well as the proper way to complete and to maintain mandatory incident reports. Failure to properly report injuries was also a basis for termination from employment with Defendant.
6. On June 15, 1999, Plaintiff injured his left elbow when he had difficulty unhooking a rear trailer, while working for Defendant. As a result of this left elbow injury, Plaintiff completed the required Employee's Notice of Injury or Recurrence form the same day that Plaintiff sustained the injury.
7. On October 7, 2006, Plaintiff was working out of Defendant's terminal in Kernersville, North Carolina. Plaintiff left Kernersville on October 7, 2006 bound for Columbus, Ohio. Prior to his departure, Plaintiff completed the required pre-trip inspection of his truck, and completed the required M-11. At approximately 10:00 p.m. on the evening of October 7, 2006, Plaintiff departed from Columbus to return to Kernersville. He was operating *Page 6 
Defendant's truck number 865058, which was a different truck from the one he drove to Columbus.
8. Plaintiff testified that on October 8, 2006, somewhere near Athens, Ohio, he hit a stretch of rough road, and his air seat "bottomed out," or lost air, causing his head to snap forward. Plaintiff further testified that his air seat was defective and that his air seat was leaking air. Plaintiff went on to testify that he had to stop either two (2) or three (3) times in order to put air into his air seat during the trip back from Columbus, and that he was wearing his shoulder belt and his lap belt at the time in question. Plaintiff described the impact from his air seat "bottoming out" as being so severe that the front end of his truck began to wobble. According to Plaintiff, after his air seat "bottomed out," he experienced an immediate onset of neck pain unlike anything he previously experienced, he developed a headache, and experienced a "heaviness" of his arm. Plaintiff indicated that his symptoms were so severe that he had to pull off of the road in order to rest, although he did not record this stop in his driver's log, as required by law.
9. Plaintiff testified that he decided to continue his trip back to Kernersville, although his neck, head, and arm symptoms all worsened as he drove. Plaintiff did not call anyone, including his dispatcher, in order to report the alleged incident at any time. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's testimony regarding his alleged October 8, 2006 work injury is not credible for the multiple reasons set forth herein.
10. When Plaintiff returned to Kernersville, he completed an M-11 for Defendant's truck number 865058, which was form number 2418328. Plaintiff checked off the box beside the notation "No Defects" on the M-11. Plaintiff acknowledged that his failure to document on *Page 7 
the M-11 that his air seat was leaking, and that the front end of the truck was wobbling, was a violation of federal law and a violation of Defendant's policies. As required at the completion of his trip to Columbus, Plaintiff turned in all of his mandatory paperwork to Defendant's dispatch office. Plaintiff did not mention a leaking air seat or a wobbling front end to the dispatcher on duty, nor did Plaintiff report his alleged injuries to anyone, as required by Defendant's policies. Moreover, Plaintiff did not complete the mandatory incident report.
11. Plaintiff first received treatment for a problem with his cervical spine on November 30, 1994, when he presented to Dr. Mark Andrew Lyerly, a neurosurgeon. On November 30, 1994, Plaintiff complained of neck pain and of right arm pain, which Dr. Lyerly ultimately diagnosed as a herniated disc at the C6-C7 level of the spine, as well as stenosis at the C3-C4 level of the spine. As a result, Dr. Lyerly performed a laminectomy and a decompression surgery on Plaintiff on December 12, 1994.
12. On January 13, 1995, Dr. Lyerly noted Plaintiff's reflexes and Plaintiff's motor strength in both of his upper extremities to be normal, which was an improvement over Dr. Lyerly's pre-surgical findings. Dr. Lyerly released Plaintiff to return to work without restrictions on January 16, 1995.
13. Although Plaintiff denied having any problems with his cervical spine from the time that Dr. Lyerly released him to return to work on January 16, 1995 until the alleged October 8, 2006 work injury, on May 22, 2002, Plaintiff returned to see Dr. Lyerly, complaining of severe neck pain and right arm pain, which he said started after he turned on his air conditioner at night. Dr. Lyerly's clinical findings upon his examination of Plaintiff on May 22, 2002 were significantly different than the clinical findings from January 1995. The cervical magnetic resonance imaging (MRI) of Plaintiff revealed spurring at the C3-C4 level, the C5-C6 level, and *Page 8 
the C6-C7 level of the spine on the right side, consistent with degenerative changes of the cervical spine. Dr. Lyerly noted that Plaintiff's neck rotation was "severely limited." Dr. Lyerly advised Plaintiff that further surgery — fusion of the C3-C7 levels of the spine — might be necessary, although Dr. Lyerly hoped to "get him better w/o any surgery."
14. On June 13, 2002, Plaintiff mentioned left shoulder pain to Dr. Lyerly for the first time, which was consistent with spondylitic changes at the C4-C5 level of the spine. Plaintiff returned to Dr. Lyerly on July 1, 2003, at which time he mentioned that coughing and sneezing aggravated his left shoulder pain, which was consistent with degenerative changes of the cervical spine.
15. When Dr. David Daniel DiLoreto first began caring for Plaintiff as his family physician in July 1998, Plaintiff reported to Dr. DiLoreto having previously undergone a cervical laminectomy. In May 2002, Plaintiff saw Dr. DiLoreto, complaining of a neck problem. Plaintiff's complaints were severe enough that Dr. DiLoreto ordered an MRI, and referred Plaintiff back to Dr. Lyerly, who performed Plaintiff's original surgery. The MRI revealed spurring at the C3-C7 levels of the spine, which was consistent with degenerative changes of the cervical spine. Dr. DiLoreto later received from Dr. Lyerly his office notes of May 2002, indicating that Plaintiff was a possible candidate for fusion of the C3-C7 levels of the spine.
16. When Plaintiff saw Dr. DiLoreto on June 26, 2006, Dr. DiLoreto noted that Plaintiff "continues to have problems with his left shoulder and neck." Plaintiff next returned to Dr. DiLoreto on October 10, 2006, following his alleged October 8, 2006 injury.
17. Based upon his history of treating Plaintiff since 1998, Dr. DiLoreto considered Plaintiff to be a "good historian." Prior to October 10, 2006, Plaintiff was able to accurately describe his symptoms, and to accurately report related information regarding his condition. For *Page 9 
example, on December 15, 2005, Plaintiff complained of left shoulder pain. He specifically told Dr. DiLoreto on that occasion that he had no history of injury.
18. When Plaintiff presented to Dr. DiLoreto on October 10, 2006, Dr. DiLoreto's nurse initially interviewed him, and then made a handwritten note in Plaintiff's chart. Thereafter, Dr. DiLoreto interviewed Plaintiff and examined him. Plaintiff informed Dr. DiLoreto that he was having numbness and weakness in his left arm and in his left leg. Further, Plaintiff associated these problems with the neck surgery performed by Dr. Lyerly 10 years earlier. Dr. DiLoreto acknowledged that he and Plaintiff specifically discussed Plaintiff's symptoms, Plaintiff's prior treatment with Dr. Lyerly, and Plaintiff's work at the October 10, 2006 office visit. Nonetheless, Plaintiff gave no history on October 10, 2006 of any type of injury occurring at work on October 8, 2006.
19. Also at the October 10, 2006 office visit with Dr. DiLoreto, Plaintiff reported that he was staggering due to his left leg weakness. Plaintiff also reported numbness in his left hand, particularly in his left thumb. Dr. DiLoreto documented in his office notes that this was "going on one and a half to two months." Dr. DiLoreto also documented in his office notes that Plaintiff reported slowly progressing symptoms, a finding which was consistent with an insidious condition related to degenerative cervical spine disease. Although Dr. DiLoreto's immediate concern was a possible stroke, his differential diagnosis included some sort of neck problem.
20. Because Dr. DiLoreto suspected that Plaintiff possibly had a stroke, he referred Plaintiff for an MRI of the brain in order to rule out a stroke. Plaintiff underwent this MRI on October 10, 2006, which ruled out a stroke. Dr. DiLoreto then ordered a cervical MRI, which Plaintiff also underwent on the same day. *Page 10 
21. At this point, Dr. DiLoreto felt that the cause of Plaintiff's complaint might be a "central lesion," or a compression of the central spinal cord caused by either a tumor, degenerative changes of the cervical spine, or a disc herniation. Dr. DiLoreto agreed that even without a history on October 10, 2006 of an acute cervical spine injury, Plaintiff's problem could have been related to degenerative cervical spine disease. Ultimately, Dr. DiLoreto ordered Plaintiff to undergo nerve conduction studies of the left arm in order to evaluate the possibility of a cervical spine deficit.
22. When Plaintiff presented to Dr. DiLoreto on October 10, 2006, he did not mention anything to Dr. DiLoreto about any type of injury while driving a truck, or anything about hitting a stretch of rough road, causing his air seat to "bottom out." Plaintiff testified that he did not report any type of work-related injury to Dr. DiLoreto because of his fear that Dr. DiLoreto would order him out of work if he mentioned being injured on the job. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's testimony that he did not report any type of work-related injury to Dr. DiLoreto because of his fear that Dr. DiLoreto would order him out of work if he mentioned being injured on the job is not credible, in light of the other evidence of record. Dr. DiLoreto testified that he does not base any decision to keep any of his patients out of work upon "how" the individual became injured.
23. After Plaintiff's October 10, 2006 office visit with Dr. DiLoreto, Plaintiff called Defendant and requested to be placed on Defendant's "sick board." When Plaintiff made this call, he did not inform the dispatcher on duty, Mr. Kelvin Merritt, that he sustained a work injury while driving on October 8, 2006.
24. On October 13, 2006, Plaintiff reported for duty and informed his union steward about the alleged October 8, 2006 work injury. The union steward advised Plaintiff to complete *Page 11 
the mandatory incident report. Plaintiff completed the mandatory incident report, in which he mentioned for the first time driving over a stretch of rough road, thereby causing his air seat to "bottom out." Plaintiff indicated on the mandatory incident report that he was driving truck number 804170, which he later acknowledged to be incorrect. Plaintiff testified that he took the number from the wrong page of his driver's log-book. When completing the mandatory incident report, Plaintiff indicated that he first reported his alleged October 8, 2006 work injury on October 11, 2006, although he later admitted at the hearing before the Deputy Commissioner that this was also incorrect. On the mandatory incident report, Plaintiff did not respond to the entry asking "To Whom Did You Report Injury?" Furthermore, Plaintiff indicated on the mandatory incident report that he never experienced "this type of injury" to his cervical spine, when, in fact, he underwent surgery in 1994 in order to remove a large herniated disc from his cervical spine.
25. On November 2, 2006, Plaintiff participated in a meeting with Defendant's management, as well as with his union representative. During this meeting, Plaintiff acknowledged all of the inconsistencies on the mandatory incident report.
26. Ms. Kristen Lynn Priest Petit, Defendant's human resources specialist for the Kernersville terminal, testified that on October 12, 2006, Plaintiff left her a voice mail message requesting to speak with her about being injured and about being in pain. Ms. Petit spoke with Plaintiff on October 13, 2006, at which time Plaintiff advised Ms. Petit that he went to his physician, who evaluated him for a stroke. Plaintiff also reported to Ms. Petit that he underwent an MRI of his cervical spine, which revealed three (3) bulging discs. Further, Plaintiff advised Ms. Pettit that after learning of the MRI results, he finally "remembered" the alleged October 8, 2006 work injury in Ohio, in which he "hit bumps" and "jarred his spine." Ms. Pettit confirmed *Page 12 
that all of Defendant's employees are instructed during their orientations, and periodically thereafter, on the importance of reporting work-related injuries, and on specifically how to do so.
27. Mr. Clifton William Evans, the garage manager at Defendant's Kernersville terminal, testified that the truck being operated by Plaintiff at the time of the alleged October 8, 2006 work injury was vehicle number 865058. Defendant placed this truck into service on September 11, 2005, which by commercial vehicle standards is considered "new." Mr. Evans obtained the complete maintenance log for vehicle number 865058, which showed all repair work and all maintenance work done on the vehicle from the date Defendant placed it into service through November 10, 2006, approximately one (1) month after Plaintiff's alleged October 8, 2006 work injury. Since Defendant placed vehicle number 865058 into service, there was never a repair to either the air seat or to the front end of the vehicle.
28. Mr. Evans also stated that Defendant's maintenance employees check the M-11 corresponding to each vehicle coming into the Kernersville terminal in order to determine whether either repair work or maintenance work are necessary. According to Mr. Evans, had any driver, including Plaintiff, completed an M-11 form indicating a problem with the air seat on vehicle number 865058, it would have been repaired. The M-11 completed by Plaintiff for vehicle number 865058 for the trip in question indicated that there were no defects on the vehicle. An M-11 report would have been required for the type of defect with Plaintiff's air seat that Plaintiff alleged occurred while he was operating vehicle number 865058 on October 8, 2006. An M-11 report also would have been required for the type of defect with the front end of vehicle number 865058 Plaintiff alleged occurred on October 8, 2006. Mr. Evans verified that all of Defendant's drivers are required by federal law to accurately complete an M-11 for each trip that they make. *Page 13 
29. The air seat on vehicle number 865058 operated by Plaintiff on October 8, 2006 was adjustable, and made to travel a distance of four (4) inches. These types of air seats have a 500,000 mile warranty. Following Plaintiff's alleged October 8, 2006 work injury, Defendant inspected the air seat on vehicle number 865058, and found it to be working properly, with no air leaks.
30. Mr. Evans also checked vehicle number 804170, which was the vehicle number recorded by Plaintiff on the mandatory incident report he completed, through Defendant's nationwide maintenance database. Vehicle number 804170 was not at the Kernersville terminal at the time of Plaintiff's alleged October 8, 2006 work injury. Defendant's nationwide maintenance database disclosed that there were no repairs to the air seat of this truck, either. Mr. Evans actually located vehicle number 804170 in another state and requested that it be inspected in order to verify that there were no problems with the air seat in it.
31. Plaintiff first reported the alleged October 8, 2006 work injury to Dr. DiLoreto on October 24, 2006. According to Dr. DiLoreto, Plaintiff informed Dr. DiLoreto that he was "driving his truck and went over some railroad tracks and his rig bounced." Plaintiff never mentioned to Dr. DiLoreto at that time anything about a leaking air seat, or that his air seat "bottomed out," causing his head to snap forward. 32. Plaintiff saw Dr. Randy Owen Krizter, a neurosurgeon, on November 1, 2006. Plaintiff presented to Dr. Kritzer complaining of "neck pain radiating into his left arm and left leg." He gave a history to Dr. Kritzer that his symptoms started when he was riding over rough terrain. According to Dr. Kritzer, Plaintiff's clinical findings were non-diagnostic. Dr. Kritzer interpreted Plaintiff's prior cervical MRI as showing "mild" abnormalities. Further, Dr. Kritzer referred Plaintiff for a cervical myelogram, which Plaintiff underwent on November 14, 2006. *Page 14 
This cervical myelogram revealed cervical spinal stenosis, with the C3-C4 level of the spine worse than the C4-C5 level of the spine, and with instability at the C3-C4 level. The only "possible" acute injury was the instability at the C3 level of the spine, but Dr. Kritzer said that it was "hard to say whether that was a chronic thing or whether that was acute." Otherwise, this cervical myelogram revealed only degenerative cervical spine disease, and a possible small disc protrusion.
33. When asked to compare Plaintiff's May 17, 2002 cervical MRI and Plaintiff's October 10, 2006 cervical MRI to the November 14, 2006 cervical myelogram, Dr. Kritzer explained that when degenerative cervical spine disease develops, it tends to get worse rather than to get better. Dr. Kritzer's comparison of all of these diagnostic studies of Plaintiff's cervical spine indicated a clear progression of his degenerative cervical spine disease. The cervical myelogram revealed "significant" degenerative changes of the cervical spine that were multi-level. Dr. Kritzer was unaware that Dr. Lyerly previously recommended a four (4) level cervical fusion in 2002. Dr. Kritzer agreed that Plaintiff's complaints of left shoulder pain, mentioned to Dr. Lyerly in 2002, were consistent with degenerative changes of the cervical spine, as were Plaintiff's complaints to Dr. DiLoreto in 2002 of shoulder pain aggravated by coughing and sneezing. Further, Dr. Kritzer explained that the "shock-like" sensation that Plaintiff reported to him as occurring in Plaintiff's arms and in Plaintiff's hands when he coughed was also consistent with degenerative cervical spine disease.
34. According to Dr. Kritzer, degenerative changes of the cervical spine can progress and cause stenosis, pain, and numbness in the upper extremities, in the hands, and in the fingers. The numbness in Plaintiff's left hand and in Plaintiff's left thumb that he described to Dr. DiLoreto on October 10, 2006 was consistent with degenerative disease of the cervical spine. *Page 15 
Dr. Kritzer agreed that the level of degenerative disease that Plaintiff had in his cervical spine could have caused the symptoms that he complained of without any precipitating event. Finally, Dr. Kritzer opined that if Plaintiff presented to him with the same symptoms that he described on November 1, 2006, with no history of hitting a stretch of rough road, his complaints would have been consistent with his degenerative cervical spine disease.
35. Plaintiff saw Dr. Lyerly on January 6, 2007, following his alleged October 8, 2006 work injury. At that time, Dr. Lyerly diagnosed Plaintiff with a myelopathy, which he distinguished from a radiculopathy. Dr. Lyerly explained that radiculopathy means that a particular nerve or several nerves are individually compressed, while myelopathy means that the spinal cord is being compressed and is not working correctly. Further, Dr. Lyerly explained that causes of a cervical myelopathy may include congenital narrowing, degenerative changes of the cervical spine over time, tumors, blood clots, abscesses, and fluid collection toward the end of the spinal cord. Finally, Dr. Lyerly indicated that the symptoms of cervical myelopathy may include difficulty balancing, spasticity, weakness in an arm or in a leg, and loss of bowel and/or bladder function.
36. When Plaintiff returned to Dr. Lyerly on January 26, 2007, he was complaining of bilateral arm pain and bilateral arm numbness. At this office visit, Dr. Lyerly did not have access to any of Plaintiff's previous medical records, although Dr. Lyerly did have an opportunity to review Plaintiff's May 17, 2002 cervical MRI, Plaintiff's October 10, 2006 cervical MRI, and Plaintiff's November 14, 2006 cervical myelogram. These studies documented continued progression of the spondylitic changes in Plaintiff's cervical spine. Although Dr. Lyerly identified a cervical myelopathy on the November 14, 2006 cervical myelogram, Dr. Lyerly could not determine whether it was acute, because he had no contact with *Page 16 
Plaintiff in three (3) years, and cervical myelopathies can develop due to chronic, rather than due to acute changes. Dr. Lyerly explained that a cervical myelogram can show the presence of a cervical myelopathy, but a cervical myelogram cannot explain when or how the cervical myelopathy occurred.
37. The history that Dr. Lyerly received from Plaintiff on January 26, 2007 indicated to Dr. Lyerly that Plaintiff was not symptomatic for "quite some time" prior to the alleged October 8, 2006 work injury. Dr. Lyerly was unaware that Plaintiff recently saw his family physician, Dr. DiLoreto, for complaints of shoulder pain and for complaints of neck pain, including Plaintiff's December 15, 2005 visit with Dr. DiLoreto for complaints of left shoulder pain that progressively became worse, and Plaintiff's June 26, 2006 visit to Dr. DiLoreto with complaints of continued neck pain and of continued shoulder pain.
38. Dr. Lyerly acknowledged that, absent the alleged October 8, 2006 work injury, it would be difficult to link his findings and his treatment to such an injury, rather than to the progression of Plaintiff's degenerative cervical spine disease, because the advanced stenotic disease Dr. Lyerly observed was sufficient, in and of itself, to explain the cervical myelopathy that he diagnosed, and to explain the treatment that he rendered. The degenerative changes of the cervical spine, alone, could have explained the cervical myelopathy that Dr. Lyerly diagnosed.
39. On January 31, 2007, Dr. Lyerly performed a C3-C7 anterior cervical discectomy and fusion on Plaintiff. This was the same procedure that he recommended for Plaintiff on May 22, 2002. Dr. Lyerly determined that Plaintiff was at maximum medical improvement by May 1, 2007, and that a functional capacity evaluation would be necessary in order to determine *Page 17 
Plaintiff's ability to work. Dr. Lyerly did indicate, however, that Plaintiff might be able to return to sedentary employment.
40. After carefully considering all of the competent, credible evidence of record, including Plaintiff's testimony and prior inconsistent statements, the Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's testimony that he sustained a work injury on October 8, 2006, either through hitting a stretch of rough road, or by his air seat losing air and "bottoming out," to be unpersuasive and to not be credible. The Full Commission finds, based upon the greater weight of the evidence, that it is neither logical nor reasonable that Plaintiff, a truck driver with over 40 years of experience, who received specific training and specific instruction from Defendant about reporting injuries, did not report his alleged October 8, 2006 work injury to Defendant on that date, when he turned in the paperwork for the trip during which the work injury allegedly occurred. Likewise, it is neither logical nor reasonable that Plaintiff also failed to report the alleged October 8, 2006 work injury to his family physician of eight (8) years, Dr. DiLoreto, whom he saw on October 10, 2006.
41. Plaintiff's treating physicians testified that the alleged October 8, 2006 work injury could have aggravated Plaintiff's degenerative cervical spine disease. However, since the evidence of the alleged October 8, 2006 work injury is rejected, as a whole, as not credible, the medical evidence fails to connect Plaintiff's degenerative cervical spine disease, which necessitated surgery, to any work injury. The testimony of Plaintiff's treating physicians establishes that, absent a specific incident or a specific accident, Plaintiff's condition can be explained by the progression of his degenerative cervical spine disease.
 *********** *Page 18 
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff did not suffer a compensable injury by accident arising out of and in the course and the scope of his employment with Defendant on October 8, 2006. N.C. Gen. Stat. § 97-2(6) (2007).
2. Plaintiff's testimony that he sustained a work injury on October 8, 2006 is not found to be credible, and is against the greater weight of the evidence. In considering the weight to be given to a witness' testimony, demeanor, believability, and consistency of the witness' testimony must be considered, along with other believable evidence.Henry v. A.C. Lawrence Leather Co., 231 N.C. 477, 57 S.E.2d 760 (1950);Withers v. Black, 230 N.C. 428, 53 S.E.2d 668 (1949).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits must be, and the same is, DENIED.
2. Each side shall bear its own costs.
This the ___ day of September 2008.
 S/___________________
 BERNADINE S. BALLANCE
 COMMISSIONER *Page 19 
CONCURRING:
 S/___________________ DANNY LEE McDONALD COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1